AUGUST SCHMITT, *Appellant*, v. W. P. BETHEA, *Appellee.*

### Opinion filed August 6, 1919.

1. If a written contract is ambiguous or obscure in its terms so that the intention of the parties cannot be understood from the language used, parol evidence of the facts and circumstances in the light 'of which the parties acted and wrote is admissible, not for the purpose of changing the terms of the written instrument, but to elucidate the words used in the contract.

2. The general rule excluding parol evidence to vary the terms of a written instrument does not apply to a mere receipt.

3 Where the Chancellor's findings 'of fact result from a misconception of the rules of evidence and their application to the facts offered in evidence, a decree in accordance with such findings which is harmful to the appellant will be reversed.

An Appeal from the Circuit Court for Hillsborough County, F. M. Robles, Judge.

Decree reversed.

*H. P. Baya,* for Appellant;

*Dickenson & Dickenson,* for Appellee.

ELLIS, J.—This is a suit by the appellee against the appellant to cancel a mortgage held by the latter upon certain lands owned by the former as a cloud upon the title to the lands and for an accounting to ascertain what, if anything, was due upon the mortgage from appellee to appellant.

Upon final hearing the Chancellor found the equities to be with the complainant Bethea, and ordered the mortgage to be cancelled upon the payment to defendant by the complainant of $248.32. From this decree Schmitt, the defendant below, appealed.

The facts in the case as we read the record are as follows: In December, 1915, Schmitt was the owner of a tract of land in Hillsborough County, consisting of about ten acres on the "Boulevard" leading from the City of Tampa to "Ballast Point." Bethea purchased this land from Schmitt and agreed to pay therefor $19,000.00. The terms which were agreed upon and carried out were that Bethea would convey to Schmitt a house and lot located in another part of the city and valued at $2,300.00, and pay fifty dollars in cash; the remainder of the purchase money amounting to $16,650.00 was to be evidenced by two promissory notes for $8,325.00 each, payable one and two years after date respectively. These notes were to be secured by a mortgage upon the ten acres conveyed by Schmitt to Bethea. The mortgage contained the following provisions: "That the said notes are to be paid in currency of the United States or by first mortgages made direct to August Schmitt or his order covering any lot or lots in the land described in this mortgage, full credit for such subsequent mortgage or mortgages to be given by August Schmitt on the notes secured by this mortgage. Such subsequent mortgages to be in conformity with the laws of Florida, and bearing eight per centum per annum interest. And until payment of said note (the mortgagor) shall pay all taxes and assessments levied or assessed on the said premises or upon this mortgage, and the money secured thereby, and shall keep the buildings which now or may hereafter be erected

thereon insured against all risk by fire in a sum not less than ——— dollars in a good and responsible insurance company for the benefit of said party of the second part."

According to an agreement between Mr. Bethea and Mr. Schmitt the former was to have the land cleared, surveyed and platted into lots and streets, to build houses and pave the streets with shell. When Mr. Bethea sold the houses and lots he was to take mortgages on them and turn the mortgages over to Mr. Schmitt as part payment on the debt.

Mr. Bethea caused the land to be platted into lots and one street running from the Tampa Boulevard on the east to the county road on the west. There were about forty lots according to the plat filed in evidence. Those lots to the south of the street were called the Bay City subdivision, and those to the north, the Pine Bluff subdivision. He spent upon the improvements on the land "approximately between five and six hundred dollars."

Some of the lots were sold by Bethea, the purchase price for which amounting to about $14,000.00, was secured by mortgages from the different buyers, and these mortgages together with about two hundred and fifty dollars were delivered to Schmitt in cancellation and discharge, as claimed by Bethea, of his mortgage to Schmitt.

In March, 1916, Schmitt executed to Bethea a receipts in the following language:

"W. P. Bethea, Contractor and Builder. Phone, 2150-L. Tampa, Florida, three, thirty-one, sixteen. Received of W. P. Bethea one note and mortgage signed by A. J. Garrett for the sum of seven hundred dollars, one note and mortgage signed by E. S. Pierce for the sum of seven hundred

dollars, one note and mortgage signed by R. P. Bethea for the sum of fourteen hundred dollars and two hundred dollars in cash, making a total of three thousand dollars, which amount, three thousand dollars, is balance in full on payment of two promissory notes given to August Schmitt for sixteen thousand six hundred and fifty dollars, ($16,650), which notes are secured by a mortgage on Bell-Vista sub. of W. P. Bethea's revised map of lot fifteen of Hawley's subdivision, section thirty-four, township twenty-nine, range eighteen, and that the said note for said sixteen thousand six hundred and fifty dollars is hereby acknowledged to be fully paid and discharged. Signed, August Schmitt, witness, A. W. Baxley and R. P. Bethea."

This was a mere acknowledgment of the receipt of money and other property in payment or satisfaction of a debt. The writing contained no independent or distinct contract.

In his answer, which was under oath, Schmitt averred that the complainant had cut some of the underbrush off the land, opened one street, dug a small well, had spent less than $500.00 in improvements, had built no houses on the land and had done nothing beyond the work mentioned to increase the value of the property. That the complainant had delivered to him a mortgage from the Tampa Plumbing and Heating Company for $2,900.00 on four of the lots, and that that sum is largely in excess of the value of the lots; that the company had paid nothing to the complainant on account of the purchase price; also a mortgage from J. L. Branch for $3,500.00 on three of the lots; that he had paid nothing on the purchase price, and the amount was greatly in excess of the value of the lots; also a mortgage from R. S. Davis for $7,200.00

on nine of the lots; that he had paid nothing on account of the purchase price which was greatly in excess of the value of the lots; also a mortgage from A. J. Garrett for $700.00 on one lot; that he paid nothing on account of the purchase price of the lot which is in excess of its value; also a mortgage from E. S. Pierce for $700.00 on one lot, and that he had paid nothing on the purchase price of the lot, which was greater than its value; also a mortgage from R. P. Bethea (a brother of complainant) for $1,400.00 on two lots, that that sum is much greater than the value of the land sold to R. P. Bethea, who had paid nothing on account of the purchase price. That all the above mortgages represent the only consideration which the respective mortgagors gave for the lots described therein, and that complainant obtained them merely for the purpose of transferring them to the defendant and claim satisfaction thereby of the mortgage to defendant and thus leave clear and unincumbered a large part of the land, and that such purpose was a fraudulent one and designed to swindle the defendant and deprive him of his security.

The evidence in the case we think wholly fails to support the complainant's case as made by his bill.

It appears that Bethea had received in cash from some of the persons to whom he sold the lots about three hundred and forty dollars, from others he received receipted bills for labor done on other property owned by Bethea, such as plastering and wiring, the latter bill amounting to fifty dollars. The cash received he applied in payment of the expense incurred in platting the land, clearing it of underbrush, digging the well, etc., the total expenditure on account of which amounted, according to his own testimony, to "approximately between five and

six hundred dollars." So that if the complainant secured the relief he sought in his bill the account would stand about as follows: He secures a property worth about $19,000.00, upon half of which mortgages exist, upon which he is not liable, the remaining half of the property is thus freed from all liens or claims so far as the defendant is concerned. This remaining half of the property valued at about $9,500.00 represents an outlay on complainant's part of about $2,750.00, of which the house and lot conveyed to defendant and cash paid amounted to $2,350.00, and the cash outlay on improvements about two hundred and fifty dollars, and two hundred dollars paid to Schmitt, leaving to complainant a profit of about $6,700.00. The receipt given by Schmitt to Bethea in March, 1916, acknowledges that the mortgages and cash then received "is balance in full on payment of two promissory notes," etc., and "acknowledges (them) to be fully paid and discharged." The mortgage from Bethea to Schmitt as well as the two notes secured thereby, provides as shown above that the mortgages on the lots sold by Bethea and which were to be made direct to Schmitt were to be received by him and he should "give full credit for the same upon (the) notes."

The meaning of this language is not clear. "Full credit for the same" is a phrase which in the connection used may not have the same significance as full credit for (the face value of) the same. And construed in the light of the surrounding circumstances, placing it in the situation of the parties at the time the writing was executed, read in the light of such facts, we think it had no such significance. Credit for the proper, just, true value of the mortgages was the evident intention of the parties. Had the lots which Bethea sold been improved by the

erection of houses upon them, so that the value of the property might be increased as his contract with Schmitt contemplated, and insurance against damage from fire taken for the latter's benefit and a substantial payment made on the purchase price, the complainant could have with more reason claimed credit for the face value of the same; but to expect by the equivocal manipulation of the property at a nominal expense to himself to secure a monetary advantage far in excess of the value of the security is to look for a harvest where he had not sown. See Solary v. Webster, 35 Fla. 363, 17 South. Rep. 646; Robinson v. Barnett, 18 Fla. 602.

The question as to what was meant by the written language when it is uncertain must be answered by considering the facts. and circumstances in the light of which the parties acted and wrote. This principle is generally recognized and was applied in the two cases cited above. See also L'Engle v. Scottish Union & National Fire Ins. Co., 48 Fla. 82, 37 South. Rep. 462; Somers v. Florida Pebble Phosphate Co., 50 Fla. 275, 39 South. Rep. 61; DeBartlett v. DeWilson, 52 Fla. 497, 42 South. Rep. 189.

The general rule excluding parol evidence to vary a written instrument does not apply to a mere receipt. Parol evidence is, on the other hand, admissible to explain, vary or contradict the writing, as a mere receipt, is only *prima facie* evidence of payment a mere admission in writing. See Vaughan v. Mason, 23 R. I. 348, 50 Atl. Rep. 390; Milos v. Covacevich, 40 Ore. 239, 66 Pac. Rep. 914; Starkweather v. Maginnis, 98 Ill. App. 143; Higley v. Burlington, C. R. & N. Ry. Co., 99 Iowa 503, 68 N. W. Rep. 829; Cramer v. Shriner, 18 Md. 140; Brown v. South Boston Sav. Bank, 148 Mass. 300, 19 N. E. Rep. 382; French v. Newberry, 124 Mich. 147, 82 N. W. Rep. 840;

Elsbarg v. Myrman, 41 Minn. 541, 43 N. W. Rep. 572; Joslin v. Giese, 59 N. J. L. 130, 36 Atl. Rep. 680; Komp v. Raymond, 175 N. Y. 102, 67 N. E. Rep. 113; Keaton v. Jones, 119 N. C. 43, 25 S. E. Rep. 710; Fire Ins. Ass'n, Limited v. Wickham, 141 U. S. 564, 12 Sup. Ct. Rep. 84; Gravlee v. Lamkin, 120 Ala. 210, 24 South. Rep. 756. The mere fact that the writing contains the words "in full" does not render such evidence inadmissible. See 9 Ency. Ev. pp. 477-480.

Now equity will not permit one to profit by his own guile as against the one at least upon whom the stratagem was practiced. So in this case Bethea should not be permitted to profit at the defendant's expense to whom he owed the duty under contract to pay in currency or in mortgages at a just and fair valuation, because having failed to make the improvements upon the property necessary to add to its value he failed to live up to his agreement with Schmitt and to carry out the evident purpose of the two contracting parties, and he could not by giving to his lots a fictitious value and selling them to financially irresponsible purchasers and taking their notes therefor transfer to the defendant that loss necessary to make his gain.

We think therefore that the Chancellor erred in his decree and the same is reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.